**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 16-1457**

PEGGY HILL; AMY WALKER,

       Plaintiffs - Appellants,

    v.

BARRY COGGINS, d/b/a Cherokee Bear Zoo; COLLETTE COGGINS, d/b/a Cherokee Bear Zoo,

       Defendants - Appellees.

_____

THE HUMANE SOCIETY OF THE UNITED STATES; THE FUND FOR ANIMALS,

       Amici Supporting Appellant.

**No. 16-1477**

PEGGY HILL; AMY WALKER,

       Plaintiffs - Appellees,

    v.

BARRY COGGINS, d/b/a Cherokee Bear Zoo; COLLETTE COGGINS, d/b/a Cherokee Bear Zoo,

       Defendants - Appellants.

_____

THE HUMANE SOCIETY OF THE UNITED STATES; THE FUND FOR ANIMALS,

Amici Supporting Appellee.

------

Appeals from the United States District Court for the Western District of North Carolina, at Bryson City.  Martin K. Reidinger, District Judge.  (2:13-cv-00047-MR-DLH)

------

Argued:  March 24, 2017                    Decided:  August 14. 2017

------

Before FLOYD and HARRIS, Circuit Judges, and John Preston BAILEY, United States District Judge for the Northern District of West Virginia, sitting by designation.

------

Affirmed in part, vacated in part, and remanded by published opinion.  Judge Floyd wrote the opinion in which Judge Harris joined.  Judge Bailey wrote a separate opinion concurring in part and dissenting in part.

------

**ARGUED:**  James S. Whitlock, DAVIS & WHITLOCK, P.C., Asheville, North Carolina, for Appellants/Cross-Appellees.  Mark R. Melrose, MELROSE LAW, PLLC, Waynesvile, North Carolina, for Appellees/Cross-Appellants.  **ON BRIEF:** Douglas A. Ruley, DAVIS & WHITLOCK, P.C., Asheville, North Carolina, for Appellants/Cross-Appellees.  Anna Frostic, THE HUMANE SOCIETY OF THE UNITED STATES, Washington, D.C., for Amici Curiae.

------

FLOYD, Circuit Judge:

Defendants Barry Coggins and Collette Coggins, doing business as the Cherokee Bear Zoo (collectively, "the Zoo"), keep, care for, and exhibit bears. In 2013, Plaintiffs Peggy Hill and Amy Walker (collectively, "Plaintiffs") visited the Zoo, and observed four of the Zoo's bears living in what Plaintiffs believed to be an inhumane setting. In response, Plaintiffs brought the instant suit against the Zoo, claiming that the Zoo's allegedly poor maintenance of its bears constitutes an unlawful taking proscribed by the Endangered Species Act (ESA), 16 U.S.C. § 1538 *et seq*.

The district court approved of Plaintiffs' standing to bring their suit, and found that the four subject bears were grizzly bears protected by the ESA. The court nonetheless concluded that the manner in which the Zoo maintains its bears—although "archaic," *Hill v. Coggins*, No. 2:13-cv-47, 2016 WL 1251190, at \*14 (W.D.N.C. Mar. 30, 2016)—does not amount to an unlawful taking.

For the reasons that follow, we affirm the district court's rulings in favor of Plaintiffs on the issues of standing and the subject bears' status as protected grizzly bears. We conclude, however, that the court's ruling against Plaintiffs on the issue of whether the Zoo is committing an unlawful taking was premised on incorrect legal analysis. We therefore vacate that ruling and remand this case for further proceedings.

I.

Plaintiffs reside within the Qualla Boundary in Cherokee, North Carolina. Plaintiffs are members of the Eastern Band of Cherokee Indians ("EBCI"). Like many

3

members of the EBCI, Plaintiffs possess a deep cultural and spiritual connection with wildlife, including bears.

On March 28, 2013, Plaintiffs visited the Zoo. Plaintiffs observed a sign on the Zoo's premises advertising grizzly bears; they then proceeded to two bear pits containing four bears, at least three of which were identified by nearby signs as grizzly bears. The pits were compact and made entirely of concrete. Each pit had a small pool of water, but neither had any vegetation nor any shade.

Plaintiffs observed the bears in listless form, pacing around in their pits. They also witnessed the bears begging for food, with patrons responding by feeding the bears apples and dry bread sold by the Zoo.

Ms. Hill observed the bears for a period of approximately thirty minutes, while Ms. Walker observed the bears for a period of fifteen to twenty minutes. Plaintiffs claim to have left feeling angry and upset with what they observed at the Zoo. Plaintiffs refuse to return to the Zoo while the bears are in their current living conditions, but they have expressed a desire to return if those conditions are improved.

After their encounter with the bears, Plaintiffs brought this citizen suit against the Zoo in federal district court. Plaintiffs alleged that the Zoo's practice of keeping four (apparent) grizzly bears in the above-described living conditions constitutes a "tak[ing]" of a threatened species proscribed by 16 U.S.C. § 1538(a)(1)(B), and possession of a "taken," threatened species proscribed by 16 U.S.C. § 1538(a)(1)(D). The basis for these allegations was Plaintiffs' view that the Zoo's conduct is a form of "harass[ment]" of, and "harm" to, its bears. *See* 16 U.S.C. § 1532(19) (defining "take" as, *inter alia*, "to

4

harass" or "harm"). Plaintiffs sought injunctive relief in response to the Zoo's alleged violations of the ESA.

The Zoo filed a motion to dismiss Plaintiffs' suit, which the district court denied on June 17, 2014. The Zoo subsequently filed a motion for summary judgment, which the district court denied on August 13, 2015. As a result, on September 17 and 18, 2015, the parties participated in a bench trial. At trial, Plaintiffs gave testimony describing their observations of the bears, their corresponding reactions, and their desires to observe the bears living in humane conditions.

Plaintiffs also presented extensive evidence demonstrating that the subject bears are grizzly bears. This evidence includes exhibits of the Zoo's webpage, entitled "Grizzlies Page," J.A. 673–74, which identified the four bears as grizzly bears; signs at the Zoo's facility identifying at least three of the four bears as grizzly bears; veterinary records identifying the four bears as grizzly bears; and United States Department of Agriculture (USDA) reports identifying at least some of the bears as grizzly bears. Additionally, Edward Ramsay, D.V.M.—one of Plaintiffs' expert witnesses and a diplomate of the American College of Zoological Medicine—identified the subject bears as grizzly bears based on his observation of distinctive shoulder humps on the bears.[1]

---

[1] Dr. Ramsay's expert identification is complicated by the fact that Plaintiffs did not cite this evidence in the appropriate disclosure documents. With that said, Dr. Ramsay stated that the appearance of the subject bears was consistent with that of grizzly bears in a declaration in support of Plaintiffs' April 30, 2015, opposition to the Zoo's motion for summary judgment. Moreover, the district court—in response to Plaintiffs' disclosure violation—appears to have given the Zoo an opportunity to designate additional expert witnesses, an opportunity that the Zoo declined. *See* Reply Br. at 16.

Finally, Plaintiffs proffered expert testimony that highlighted serious deficiencies in the Zoo's treatment of its bears. Dr. Ramsay and Ms. Else Poulson—a zookeeper and animal behaviorist—testified that the Zoo's virtually barren concrete pit enclosures, public feeding arrangements, and apparent lack of meaningful enrichment programs fell short of generally accepted animal husbandry practices. Ms. Poulsen added that the small concrete pits prompted the bears to engage in the abnormal behavior of pacing. Ms. Poulsen, along with Dr. Ramsay, also identified the bears' act of begging for food as an abnormal behavior that was attributable to the Zoo's practice of public feeding and its inadequate nourishment of the bears.

The Zoo attempted to push back on Plaintiffs' evidentiary presentation. Ms. Coggins testified that the Zoo had described the subject bears as grizzly bears only for promotional purposes. Additionally, David Ackerman, D.V.M.—the Zoo's primary veterinary care provider—testified that the subject bears are European brown bears.

Ms. Coggins and Dr. Ackerman also testified that the subject bears are in good health, and do not demonstrate abnormal behavior. Dr. Ackerman added that although current zookeeping practices for brown bears—a category that includes grizzly bears— provide for more space and a more natural environment than the Zoo currently provides, he has had discussions with Mr. Coggins about implementing such practices in the future.

On March 30, 2016, the district court issued its decision in this case. *Hill*, 2016 WL 1251190. The court first held that Plaintiffs had standing to litigate their ESA suit, because Plaintiffs had demonstrated that the Zoo was injuring their aesthetic interest in viewing the subject bears in a setting compatible with the ESA, in a manner that could be

6

redressed by injunctive relief calling for such a setting. The court then considered the conflicting evidence, weighed the credibility of witnesses, assessed the relevant discovery history, and arrived at the conclusion that the subject bears are grizzly bears protected by the ESA.

In the end, however, the court ruled against Plaintiffs on the issue of the Zoo's ESA liability. After examining the relevant regulations, the court concluded that the Zoo's manner of maintaining its bears did not—for ESA purposes—harm or harass the bears, and by extension did not subject the bears to a taking.

Of note, the court based its conclusion that the Zoo did not harass its bears entirely on its determination that the Zoo's animal husbandry practices complied with applicable standards under the Animal Welfare Act (AWA), 7 U.S.C. § 2131 *et seq.* The court explicitly declined to consider whether the Zoo's practices complied with "generally accepted" animal husbandry practices, despite language in the relevant regulation referencing a "generally accepted" standard. *See* 50 C.F.R. § 17.3 (explaining that the definition of "[h]arass" under the ESA excludes "*generally accepted* . . . [a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the [AWA]" (emphasis added)). The court also found it unnecessary to consider whether the Zoo's practices are of an injurious or disruptive nature.

After concluding that the Zoo was not liable under the ESA, the court dismissed with prejudice the entirety of Plaintiffs' suit. Plaintiffs filed a timely appeal from the district court's judgment, and contest the court's determination that the Zoo is not committing a taking. The Zoo filed a timely cross-appeal, and contests the court's

7

determinations that Plaintiffs have standing in this case and that the subject bears are grizzly bears protected by the ESA. The appeal and the cross-appeal were consolidated, and we possess jurisdiction to review them both pursuant to 28 U.S.C. § 1291.

## II.

We review a district court's legal determinations, including its rulings as to whether a party possesses standing and its interpretations of regulations, de novo. *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 342 (4th Cir. 2013) (standing); *United States v. Boynton*, 63 F.3d 337, 342 (4th Cir. 1995) (interpretation of regulations). We review a district court's findings of fact for clear error. *See Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 512 (4th Cir. 2002). "We review a district court's discovery rulings, as well as its decision to admit particular expert testimony, for abuse of discretion." *Bresler v. Wilmington Trust Co.*, 855 F.3d 178, 189 (4th Cir. 2017).

## III.

As a threshold matter, we must determine whether Plaintiffs possess Article III standing to bring this suit against the Zoo. *See United States v. Under Seal*, 853 F.3d 706, 721 (4th Cir. 2017). We conclude that they do.

## A.

To satisfy Article III's standing requirements, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable decision." *Spokeo, Inc. v. Robins*, 136

S. Ct. 1540, 1547 (2016). "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.*

B.

The district court held that Plaintiffs satisfied all three standing elements. We agree.

To begin, Plaintiffs' claim that the Zoo is depriving them of a right to personally observe the Zoo's bears living in a setting compatible with the ESA constitutes an aesthetic injury that satisfies the first standing element of injury in fact.

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Courts frequently treat an aesthetic interest in the observation of animals as a legally protected interest. *See Lujan*, 504 U.S. at 562–63 (explaining that "the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing" (citing *Sierra Club v. Morton*, 405 U.S. 727, 734 (1972))); *Am. Soc'y for Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 337 (D.C. Cir. 2003) (concluding that "an injury in fact can be found when a defendant adversely affects a plaintiff's enjoyment of flora or fauna, which the plaintiff wishes to enjoy again upon the cessation of the defendant's actions"). When that interest is invaded in a real, non-speculative, and personal manner, the requirement of an actual or

imminent, concrete, and particularized injury is satisfied. *See Spokeo*, 136 S. Ct. at 1548–49 (explaining the concreteness and particularization conditions); *see also Lujan*, 504 U.S. at 563–64 (rejecting plaintiffs' claim that they suffered actual or imminent injury from government action that allegedly harmed endangered species living in foreign countries, because the plaintiffs only expressed speculative "'some day' intentions" to visit those countries).

In this case, Plaintiffs claim a strong interest in observing the Zoo's bears living in conditions that do not violate the ESA. They explain, however, that they are precluded from observing the bears living in such conditions because the bears are currently being mistreated. Plaintiffs add that they are willing and able to go back and visit the bears if the conditions that the bears live in are improved. These claims, if true, are sufficient to establish injury in fact under the relevant precedent.

Importantly, the district court found Plaintiffs' claims credible. The court defended its finding of injury by highlighting the "spiritual and cultural connection with the bears" that Plaintiffs, as members of the EBCI, possessed. *Hill*, 2016 WL 1251190, at *9. The court also cited definite statements by Plaintiffs confirming their intent to return to the nearby Zoo if the bears' setting improved. *See, e.g., id.* at *3 (noting that Ms. Walker claimed she "certainly would go" to observe the bears if they were given a more humane setting); *cf. Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (holding that plaintiffs had standing to sue where they offered conditional statements that they would use a nearby river if the discharge of pollutants in the river ceased). The court recognized that Plaintiffs only observed the bears for fifteen

to thirty minutes, but reasonably attributed their somewhat short observation time to the upsetting nature of the bear scene. *Hill*, 2016 WL 1251190, at *3. We discern no clear error in these sound credibility determinations.

Having found that Plaintiffs satisfy the injury in fact element, the second and third standing elements easily follow. The Zoo is maintaining its bears in the setting that Plaintiffs complain of, and so Plaintiffs' alleged aesthetic injury is fairly traceable to the Zoo. Finally, Plaintiffs claim that they are being deprived of a right to observe the bears living in a setting that does not violate the ESA, and this can be redressed by an injunction directing the Zoo to maintain its bears in such a setting.

## IV.

### A.

Secure in the justiciability of this case, we now consider whether the bears in this case are grizzly bears protected by the ESA. We agree with the district court's determination that Plaintiffs have proven that the subject bears are indeed grizzly bears.

The district court's determination is corroborated by several pieces of evidence whose admission is not contested on appeal. These include the Zoo's online representations, signs, and veterinary records—as well as USDA reports—that collectively identify the subject bears as grizzly bears. *Hill*, 2016 WL 1251190, at *3–4.

The district court's determination is also corroborated by trial testimony from Plaintiffs' expert, Dr. Ramsay, who identified the subject bears as grizzly bears based on his observation of distinctive shoulder humps on the bears. *Id.* at *5.

11

The district court's determination, moreover, was reached after sensibly rejecting the Zoo's contrary evidence. The court acknowledged Ms. Coggins's claim that the subject bears were referred to as grizzly bears simply for promotional purposes, but found her testimony in that matter "not credible" in light of the Zoo's representations to the USDA that those bears are grizzly bears. *Id.* The court also acknowledged that the Zoo's veterinarian, Dr. Ackerman, had testified that the subject bears are European brown bears, but concluded that this testimony was undermined by contrary representations in his veterinary certifications. *Id.* These are well-reasoned credibility determinations that we are unwilling to disturb. *See F.T.C. v. Ross*, 743 F.3d 886, 894 (4th Cir. 2014) ("In cases in which a district court's factual findings turn on assessments of witness credibility or the weighing of conflicting evidence during a bench trial, such findings are entitled to even greater deference [than usual]." (internal quotation marks omitted)).

In sum, the district court was entirely justified in concluding that the subject bears are grizzly bears, and are therefore protected by the ESA.

B.

Nonetheless, the Zoo contests the district court's determination that the subject bears are grizzly bears on the grounds that—in the Zoo's view—Dr. Ramsay's expert identification was improperly admitted. The basis for the Zoo's challenge to Dr. Ramsay's expert identification is that this evidence was not cited in the disclosure report produced by Plaintiffs and Dr. Ramsay pursuant to Rule 26 of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (requiring parties to disclose "complete

statement of all opinions the [expert] witness will express and the basis and reasons for them"). The district court acknowledged this issue, but reasoned that Plaintiffs' Rule 26 violation was harmless. *See Hill*, 2016 WL 1251190, at \*4 n.6. We affirm.

"District courts are accorded 'broad discretion' in determining whether a party's nondisclosure or untimely disclosure of evidence is substantially justified or harmless." *Bresler*, 855 F.3d at 190 (quoting *Wilkins v. Montgomery*, 751 F.3d 214, 222 (4th Cir. 2014)). In making this determination, a district court should be guided by the five *Southern States* factors:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). "The first four factors . . . relate primarily to the harmlessness exception, while the last factor, addressing the party's explanation for its nondisclosure, relates mainly to the substantial justification exception." *Bresler*, 855 F.3d at 190.[2]

Regarding the first factor, the Zoo had prior notice of Dr. Ramsay's opinion that undermines its claim of unfair surprise. Dr. Ramsay stated that the appearance of the bears was consistent with that of grizzly bears in a declaration in support of Plaintiffs'

---

[2] We recognize that the district court did not explicitly address the *Southern States* factors. Even so, "the district court was not *required* to tick through each of the *Southern States* factors. *Southern States* explains that district courts have 'broad discretion' to decide harmlessness and 'should'—not 'shall'—'be guided by' the five factors." *Wilkins*, 751 F.3d at 222 (quoting *S. States*, 318 F.3d at 597).

April 30, 2015, opposition to the Zoo's motion for summary judgment. He provided his expert identification of the bears at the bench trial almost five months later in late September 2015.

As for the second factor, the district court gave the Zoo an opportunity to designate additional expert witnesses in response to the Zoo's concerns about timing. The Zoo therefore had an opportunity to mitigate the effect of any unfair surprise. Although the Zoo decided not to avail itself of this opportunity, we cannot fault Plaintiffs for this independent decision made by the Zoo.

With respect to the third factor, Dr. Ramsay's expert identification cannot fairly be labeled a trial disruption. This identification only addressed the discrete point of whether or not the subject bears are grizzly bears. It did not "interject an additional, and considerably complex, legal theory" into the case, nor did it "substantially change the character of the case and render obsolete much of the parties' trial preparation." *Rambus, Inc. v. Infineon Tech. AG*, 145 F. Supp. 2d 721, 730 (E.D. Va. 2001).

Moving on to the fourth factor, Dr. Ramsay's expert identification was admittedly important in that it helped establish a prerequisite to Plaintiffs' claims for relief. The importance of this identification is somewhat diminished, however, given that Plaintiffs had already proffered considerable, independent evidence establishing that prerequisite.

Finally, with regards to the fifth factor, we assume for the sake of argument that Plaintiffs lacked an adequate explanation for their discovery violation. As noted above, however, this factor is primarily related to the substantial justification exception, and so it sheds little light on the harmlessness exception under consideration here.

In sum, the factors most relevant to the harmlessness inquiry weigh in favor of, or are at least neutral in regards to, the admission of Dr. Ramsay's expert identification. As such, the district court did not abuse its broad discretion in excusing Plaintiffs' non-compliance with Rule 26 on harmlessness grounds.[3]

## V.

We now turn to the heart of this case—the question of whether the district court correctly held that the Zoo did not engage in an unlawful taking of its captive grizzly bears. As explained below, we conclude that this holding was the result of incorrect legal analysis; we consequently vacate this holding and remand this case to the district court for further consideration.

## A.

The ESA prohibits the "tak[ing]" of any endangered or threatened species, 16 U.S.C. § 1538(a)(1)(B), and makes it unlawful to possess any endangered or threatened species that has been unlawfully "taken," *id.* § 1538(a)(1)(D). Grizzly bears in the lower forty-eight states are considered threatened species. 50 C.F.R. § 17.11(h).

---

[3] The Zoo raises additional challenges to other evidentiary decisions by the district court, but we decline to address them. The uncontested evidence and Dr. Ramsay's expert identification constitute overwhelming evidence that the subject bears are grizzly bears, such that the Zoo could not possibly have been prejudiced by the arguably improper admission of any additional evidence confirming that point. *See Tire Eng'g & Distrib., LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 314 (4th Cir. 2012) (per curiam) ("Rule 61 [of the Federal Rules of Civil Procedure] directs courts to disregard any error or defect in the proceeding unless the error is prejudicial: It must have affected the outcome of the district court proceedings." (internal quotation marks omitted)).

15

The ESA expansively defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Plaintiffs contend that the manner in which the Zoo maintains its bears constitutes harassment and harm proscribed by the ESA. We consider each claim in turn.

B.

1.

We begin by addressing Plaintiffs' harassment claim. The Fish and Wildlife Service (FWS) of the U.S. Department of the Interior defines "[h]arass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. This regulatory definition contains certain exclusions:

> This definition, when applied to captive wildlife, does not include *generally accepted*:
>
> (1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the [AWA],
>
> (2) Breeding procedures, or
>
> (3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.

*Id.* (emphasis added). The Secretary of Agriculture is responsible for promulgating facilities and care standards under the above-referenced AWA. *See* 7 U.S.C. § 2143(a); *see also People for the Ethical Treatment of Animals v. United States Dep't of Agric.*, 861

16

F.3d 502, 505 n.1 (4th Cir. 2017) ("The [AWA] authorizes the Secretary of Agriculture, who falls within the USDA, to administer the Act.").

At issue in this case is the proper interpretation of the first enumerated exclusion.[4] The district court interpreted this exclusion to excuse animal husbandry practices that are compliant with applicable AWA standards, without regard to whether those practices are "generally accepted." Plaintiffs urge us to reject this interpretation, explaining that the exclusion can only fairly be interpreted to excuse animal husbandry practices that are both (1) "generally accepted" and (2) AWA compliant. We agree with Plaintiffs' position on this matter.

Plaintiffs' interpretation necessarily follows from the relevant regulatory text. The first enumerated exclusion specifically requires AWA compliance, and it is preceded by a "generally accepted" requirement that applies to the disjunctive list of enumerated exclusions. It is therefore clear that the first enumerated exclusion is comprised of both a "generally accepted" requirement and an AWA compliance requirement.

The district court's contrary interpretation renders meaningless the phrase "generally accepted" in 50 C.F.R. § 17.3. It therefore conflicts with basic principles of legal interpretation. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is a cardinal principle of statutory [and regulatory] construction that a statute [or regulation]

---

[4] Although the Zoo has complained about the clarity of the first enumerated exclusion, we note that it does not challenge the validity of this exclusion or any other feature of 50 C.F.R. § 17.3. Thus, this is strictly a case about regulatory interpretation.

17

ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." (internal quotation marks omitted)).[5]

Moreover, by reading the "generally accepted" requirement out of the first enumerated exclusion from 50 C.F.R. § 17.3's definition of harass, the district court narrows the scope of what constitutes harassment and, by extension, the scope of what constitutes a proscribed taking of protected animals under the ESA. The district court's interpretation also makes it so that the first enumerated exclusion is necessarily satisfied whenever a defendant complies with the Secretary of Agriculture-administered AWA. This protection-narrowing, Secretary of Agriculture-centered outcome is in tension with what the Supreme Court has explained Congress had in mind in enacting the ESA: a "broad purpose to protect endangered and threatened wildlife," which was to be advanced in large part through "broad administrative and interpretive power [delegated] to the Secretary [of the Interior]." *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Oregon*, 515 U.S. 687, 700, 708 (1995) (citing 16 U.S.C. §§ 1533, 1540(f)).

The impropriety of treating as meaningless the "generally accepted" language in 50 C.F.R. § 17.3 is especially apparent when one considers the entire set of exclusions impacted by that language. Specifically, the second enumerated exclusion from 50 C.F.R. § 17.3's definition of harass excuses "generally accepted . . . [b]reeding procedures." If the phrase "generally accepted" was deemed meaningless, then we would

---

[5] "We normally construe regulations using the same rules we employ to construe statutes." *Harris v. Norfolk S. Ry. Co.*, 784 F.3d 954, 962 (4th Cir. 2015).

18

end up with the absurd result whereby all breeding procedures—from the benign to the cruel—would fall outside the scope of the regulatory definition of harass. This cannot be so. *See Chesapeake Ranch Water Co. v. Bd. of Comm'rs of Calvert Cty.*, 401 F.3d 274, 280 (4th Cir. 2005) (cautioning against interpretations of text that lead to "an absurd conclusion") (quoting *In re Chapman*, 166 U.S. 661, 667 (1897)).

2.

Having rejected the district court's interpretation of the first enumerated exclusion from 50 C.F.R. § 17.3's definition of harass, we now address the appropriate disposition for this case.

To establish harassment in this case, Plaintiffs must prove (1) that the Zoo's animal husbandry practices fall within 50 C.F.R. § 17.3's definition of harass, and (2) that those practices do not fall within the first enumerated exclusion from that definition. The first issue remains unresolved because the district court did not reach it. The second issue remains unresolved in light of our holding that the district court improperly declined to ask whether the Zoo's animal husbandry practices are "generally accepted" before it invoked the first enumerated exclusion.[6]

It is therefore appropriate to remand this case to the district court to resolve these issues in the order of its choosing. *See Singleton v. Wulff*, 428 U.S. 106, 120 (1976) ("It

---

[6] As for the district court's finding that the Zoo's animal husbandry practices satisfy the AWA compliance requirement of the first enumerated exclusion, we accept that finding as true, because Plaintiffs have not contested it on appeal.

19

is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."). We add that if the district court rules against Plaintiffs on one of these issues, then it need not reach the other issue, because Plaintiffs must prevail on both issues in order to establish ESA liability.

## C.

In addition to challenging the district court's rejection of its claim that the Zoo engaged in a taking by *harassing* the grizzly bears, Plaintiffs also briefly challenge the court's rejection of its claim that the Zoo engaged in a taking by *harming* the grizzly bears. We reserve judgment on this challenge.

We do so as a result of the unique posture of this case. To elaborate, the regulatory definition of harass contains requirements that are less demanding for Plaintiffs—whose suit centers on behavioral interference evidence—than are the requirements contained in the regulatory definition of harm.[7] Therefore, we believe it is prudent to grant the district court an opportunity to address the application of the regulatory definition of harass in the first instance before we review the difficult question of the application of the regulatory definition of harm. This course of action is especially appropriate in light of the fact that the parties' appellate briefs focused primarily on

[7] *Compare* 50 C.F.R. § 17.3 (defining "[h]arass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering") *with id.* (defining "[h]arm" as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering").

20

analyzing harassment, not harm. *Cf. Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 515 (4th Cir. 2015) (reserving judgment on a question outside of what the "appellate briefs centered on," in a case that was being remanded to the district court).

VI.

For the foregoing reasons, we affirm the district court's determinations that Plaintiffs have standing in this case and that the subject bears are grizzly bears.

We conclude, however, that the district court's determination that the Zoo is not committing a taking was based on incorrect legal analysis. We therefore vacate that determination and remand this case for further proceedings consistent with this opinion.

*AFFIRMED IN PART;*
*VACATED IN PART AND REMANDED*

BAILEY, District Judge, concurring in part and dissenting in part:

I am pleased to concur in that part of the majority opinion affirming the District Court's decision with respect to Article III standing and the fact that the subject bears are indeed grizzly bears. I feel compelled, however, to respectfully dissent from the majority's interpretation of 50 C.F.R. § 17.3.

50 C.F.R. § 17.3 provides:

Harass in the definition of "take" in the Act means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering. This definition, when applied to captive wildlife, does not include generally accepted:

(1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act,

(2) Breeding procedures, or

(3) Provisions of veterinary care for confining, tranquilizing, or anesthetizing, when such practices, procedures, or provisions are not likely to result in injury to the wildlife.

Harm in the definition of "take" in the Act means an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly

22

impairing essential behavioral patterns, including breeding, feeding or sheltering.

50 C.F.R. § 17.3.

"'When a species ... is listed as either "threatened" or "endangered" under the [ESA], it is then subject to a host of protective measures designed to conserve the species.' *Safari Club Int'l v. Salazar (In re Polar Bear Endangered Species Act Listing & Section 4(d) Rule Litig. - MDL No. 1993)*, 709 F.3d 1, 2 (D.C. Cir. 2013). The species are subject, for example, to the section 9 prohibitions, which make it unlawful 'for any person subject to the jurisdiction of the United States' to, *inter alia*, 'import[,]' 'export [,]' 'possess, sell, deliver, carry, transport, or ship, by any means whatsoever[,]' 'take any such species within the United States or the territorial sea of the United States[,]' 'deliver, receive, carry, transport, or ship in interstate or foreign commerce, by any means whatsoever and in the course of a commercial activity, any such species[,]' or to 'sell or offer for sale in interstate or foreign commerce any such species[.]' 16 U.S.C. § 1538(a); *see also Humane Soc'y of U.S. v. Kempthorne*, 527 F.3d 181, 182 (D.C. Cir. 2008); . . ..

"The prohibition on 'take' means that it is unlawful 'to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct.' 16 U.S.C. § 1532(19). In particular, the term 'harm' refers to 'an act which actually kills or injures wildlife[,]' while the term 'harass' means 'an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding or sheltering.' 50 C.F.R. § 17.3. When applied to captive

23

animals, the definition for 'harass' does not include the 'generally accepted' practices of animal husbandry, breeding, or aspects of veterinary care. *Id*." *Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 30-31 (D. D.C. 2013).

For a threatened species, like the grizzly bear, the ESA provides that the FWS or the National Marine Fisheries Service shall promulgate regulations that they deem "necessary and advisable to provide for the conservation of such species," including applying some or all of the Section 9 prohibitions to the threatened species. 16 U.S.C. § 1533(d).

FWS regulations specifically prohibit the "taking" of any grizzly bear in the 48 conterminous states of the United States, including North Carolina. 50 C.F.R. § 17.40(b)(1)(i)(A).

In promulgating the exception for captive animals contained in 50 C.F.R. § 17.3, the Fish and Wildlife Service stated that the "purpose of amending the Service's definition of 'harass' is to exclude proper animal husbandry practices that are not likely to result in injury from the prohibition against 'take.' Since captive animals can be subjected to improper husbandry as well as to harm and other taking activities, the Service considers it prudent to maintain such protections, consistent with Congressional intent." *Captive-bred Wildlife Regulation*, 63 FR 48634-02 (September 11, 1998).

The FWS further stated that "'Harass' under the definition of 'take' in §17.3 is an act or omission that creates the likelihood of injury by annoying wildlife to such an extent as to significantly disrupt normal behavior patterns. The applicability of this concept to captive-held animals has been unclear, since human activities, including normal

24

husbandry practices, provided in caring for captive-held wildlife in all probability disrupt behavior patterns." *Id.*

The FWS added that "[i]n light of this, the definition of 'harass' in 50 CFR 17.3 is modified to exclude normal animal husbandry practices that are not likely to result in injury such as humane and healthful care when applied to captive wildlife. While no permit is required to possess lawfully acquired listed wildlife, a person cannot possess wildlife without doing something to it that might be construed as harassment under a literal interpretation of the definition in use since 1979, e.g., keep it in confinement, provide veterinary care, etc. Under this scenario, a person who legally possessed wildlife without a permit could be considered in violation of the prohibition against harassment unless they obtained a specific permit that authorized them to conduct normal animal husbandry activities. Had Congress intended this result, the prohibition on possession in section 9 of the Act would not have been limited to endangered species taken in violation of the Act." *Id.*

The crux of this case is the appropriate construction of 50 C.F.R. § 17.3. An issue of statutory construction is reviewed *de novo*. *United States v. Hilton*, 701 F.3d 959 (4th Cir. 2012).

The interpretation adopted by the majority would have the standards to be applied to holders of captive, threatened animals established, not by the FWS, but rather by some amorphous set of "generally applicable" standards adopted by the AZA (representing less than 10% of the zoos in this country) or some other group. In analyzing the regulation, it is important to recall that the statute provides criminal sanctions for violations of its

25

terms or of the regulations adopted pursuant thereto - a fact the majority ignores. In short, the ESA has both criminal and non-criminal aspects.

In light of the criminal aspect, the rule of lenity could be deemed to be in play. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined. Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (footnotes omitted).

The rule of lenity "reflects not merely a convenient maxim of statutory construction. Rather, it is rooted in fundamental principles of due process which mandate that no individual be forced to speculate, at peril of indictment, whether his conduct is prohibited. *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972); *United States v. Harriss*, 347 U.S. 612, 617 (1954); *Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939); *McBoyle v. United States*, 283 U.S. 25, 27 (1931). Thus, to ensure that a legislature speaks with special clarity when marking the boundaries of criminal conduct, courts must decline to impose punishment for actions that are not 'plainly and unmistakably'

26

proscribed. *United States v. Gradwell*, 243 U.S. 476, 485, 37 S.Ct. 407, 410, 61 L.Ed. 857 (1917)." *Dunn v. United States*, 442 U.S. 100, 112-13 (1979).

"The rule of lenity is based on two substantial considerations. First, the rule recognizes that 'a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed.' *Yi v. Fed. Bureau of Prisons*, 412 F.3d 526, 535 (4th Cir. 2005) (quoting *Babbitt v. Sweet Home Chapter of Cmtys.*, 515 U.S. 687, 704 n. 18 (1995)). Second, the rule acknowledges that Congress, rather than the judiciary, is the proper institution to define criminal conduct. *Id*." *United States v. Hilton*, 701 F.3d 959, 968 (4th Cir. 2012).

While it is unclear whether the rule of lenity applies in a civil dispute, in *Esquivel-Quintana v. Lynch*, 810 F.3d 1019 (6th Cir. 2016), *reversed*, 137 S.Ct. 1562 (2016), the Sixth Circuit noted that the reasons for the rule are equally applicable in cases where a regulation has both civil and criminal ramifications, stating that "[a]n increasingly emergent view asserts that the rule of lenity ought to apply in civil cases involving statutes that have both civil and criminal applications. *See Whitman v. United States*, ___ U.S. ___, 135 S.Ct. 352, 352-54 (2014) (Scalia, J., statement respecting denial of certiorari); *Carter v. Welles-Bowen Realty, Inc.*, 736 F.3d 722, 729-36 (6th Cir. 2013) (Sutton, J., concurring). This view is based on two principles. First, statutory terms should not have different meanings in different cases - 'a statute is not a chameleon.' *Carter*, 736 F.3d at 730. Second, ambiguous statutes must be construed in favor of defendants under the rule of lenity. The rule of lenity ensures that the public has adequate notice of what conduct is criminalized, and preserves the separation of powers

by ensuring that legislatures, not executive officers, define crimes. Taken together, these two principles lead to the conclusion that the rule of lenity should apply in civil cases involving ambiguous statutes with criminal applications." *Esquivel-Quintana*, at 1023.

The Supreme Court *has* suggested that the rule of lenity should apply in such cases. In *Leocal v. Ashcroft*, 543 U.S. 1 (2004), the Court reviewed a Board of Immigration Appeals decision interpreting 8 U.S.C. § 1101(a)(43)(F). 543 U.S. 1, 8-13 (2004). That provision states that a conviction for a 'crime of violence (as defined in section 16 of Title 18, but not including a purely political offense)' counts as an aggravated felony if it is punishable by at least one year of imprisonment. The Court held that 'crime of violence' did not include the petitioner's Florida DUI conviction, and added in a footnote:

> Even if § 16 lacked clarity on this point, we would be constrained to interpret any ambiguity in the statute in petitioner's favor. Although here we deal with § 16 in the deportation context, § 16 is a criminal statute, and it has both criminal and noncriminal applications. Because we must interpret the statute consistently, whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies. Cf. *United States v. Thompson/Center Arms Co.,* 504 U.S. 505, 517–518 (1992) (plurality opinion) (applying the rule of lenity to a tax statute, in a civil setting, because the statute had criminal applications and thus had to be interpreted consistently with its criminal applications).

543 U.S. at 12, n. 8.

Similarly, in *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1 (2011), and *Maracich v. Spears*, ___ U.S. ___, 133 S.Ct. 2191, 2209 (2013), the Court suggested that the rule of lenity could apply if an ambiguity existed, but had no occasion to apply it because the statute was unambiguous." *Id*.

An application of the rule of lenity to the regulatory framework adopted by the majority clearly indicates that the same cannot pass muster. As envisioned by the majority, whether an action or inaction on the part of a zookeeper was legal would depend on the current opinion, not codified in any form, of non-government members of certain associations or the general public. Such a framework hardly provides a person with fair warning of what the law intends to do if a certain line is passed. In addition, such a framework violates the separation of powers by allowing non-governmental entities, not legislatures, or even executive officers, define crimes.

Inasmuch as the majority's framework is unworkable and violative of due process, the only appropriate reading of the regulation is that the Secretary of Agriculture, taking into consideration generally accepted practices, is to determine, establish, and enforce the minimum standards for operators holding captive, threatened animals.

Were the rule of lenity not to apply, the majority's interpretation of the regulation still violates the rubrics of statutory construction.

In interpreting a statute, "[w]e give the words of a statute their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import." *Wall v. Kholi*, 562 U.S. 545, 551 (2011), quoting *Williams v. Taylor*, 529 U.S. 420, 431 (2000).

29

"It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted); *see United States v. Menasche*, 348 U.S. 528, 538-39 (1955) ('It is our duty "to give effect, if possible, to every clause and word of a statute."' (quoting *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883)))." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

The District Court was correct in its conclusion of law that according to the plain language of 50 C.F.R. § 17.3, an exhibitor's husbandry practices which comply with the minimum standards for facilities and care under the AWA fall outside the definition of "harassment" as set forth in the ESA and in concluding that "[o]nly when the exhibitor's practices fail to meet the minimum standards established by the Animal Welfare Act can such practices constitute 'harassment' of a captive endangered or threatened species." *Hill v. Coggins*, 2016 WL 1251190, at \*13 (W.D. N.C. Mar. 30, 2016).

The focus of 50 C.F.R. § 17.3(1) is on the standards promulgated under the AWA - not upon some ambiguous and undefinable "generally accepted" standards disconnected from the standards of the AWA. Adopting the majority's interpretation ignores the clear intent of the ESA to allow the AWA to establish the standards regarding acceptable husbandry practices. Under 16 U.S.C. § 1533(d), it is the FWS that is to promulgate regulations that are deemed "necessary and advisable to provide for the conservation of such species."

The majority's interpretation also places the court in the untenable position of being required to become a non-judicial rule making body determining exactly what are "generally accepted" animal husbandry practices. Are the accreditation standards of the AZA, a voluntary organization that encompasses less than ten percent of the exhibitors in the United States necessarily "generally accepted?" The difficulty in determining what is a "generally accepted" husbandry practice is proof that the issue is not one for judicial determination. Rather, the determination of what is "generally accepted" is why the ESA defers to the AWA on this issue.

The District Court's interpretation of 50 C.F.R. § 17.3 does not permit the AWA standards to supercede the ESA's authority to protect threatened species. Rather, the regulation utilizes the framework of the AWA for evaluation of the adequacy of animal husbandry practices for captive animals. Should the FWS become unsatisfied with the standards of the AWA, the FWS has the authority to amend the regulatory scheme to provide for more stringent protections for threatened or endangered species.

The Plaintiffs' argument that the FWS regulatory language creating the "harass" exception for captive wildlife found at 63 Fed. Reg. 48636, requires that the courts look outside the enforcement of the AWA by the Department of Agriculture's Animal Plant and Health Inspection Service ("APHIS") to determine what is "generally acceptable"[1] is

---

[1] "FWS made it clear that in determining whether treatment of captive endangered species was considered 'generally accepted' under the captive wildlife exception to 'harass' it was not looking only to [APHIS], which is charged with administering the AWA, but also to 'knowledgeable persons in the zoo and aquarium communities.'" Brief of Appellants at 29-30.

31

not a proper interpretation of that provision. A full reading of the surrounding language with the comments section supports the opposite conclusion - that the Fish and Wildlife Service decides the applicable standards for animal husbandry:

> To evaluate facilities and care provided by applicants, the [Fish and Wildlife Service] will continue to consult with experts such as the Department of Agriculture's Animal and Plant Health Inspection Service, which is charged with administering the Animal Welfare Act, and knowledgeable persons in the zoo and aquarium communities and the private sector as needed.

*Id.*

Rather than allowing for private experts to testify what the appropriate standards for animal husbandry are, this language indicates that the FWS may consult with experts at APHIS and private experts in determining whether any change in the standards is warranted. This comment in no way makes private expert opinions that were not incorporated by the FWS into the ESA relevant to the issue as to the applicable standard of "generally accepted animal husbandry practices that meet or exceed the minimum standard for facilities and care under the Animal Welfare Act." 50 C.F.R. § 17.3(1). As a result, the District Court did not err in its conclusion that "[w]hether the CBZ's practices are generally accepted by other zookeepers or meet certain standards established by state law or voluntary accrediting associations such as the AZA is not relevant." 2016 WL 1251190, at *13.

The majority expresses concern that the District Court's construction of § 17.3 would negate the breeding procedure and veterinary care portions of the regulation. It is readily apparent that the drafters of the regulation saw fit to treat animal husbandry differently than the other provisions.

There is a rational explanation for this differential. The standard of care for veterinary practice is, like the standard of care or medical practice, well established. Breeding practices are virtually a subset of the veterinary standard. Animal husbandry practices are not so well established and, as noted, above, should not be left to an amorphous segment of expert or public opinion.

The only appropriate reading of the regulation is that the Secretary of Agriculture, taking into consideration generally accepted practices, is to determine, establish, and enforce the minimum standards for operators holding captive, threatened animals.

I would affirm the judgment of the District Court.